**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**CYNTHIA M. WILLIAMS,**
        **Plaintiff,**

**v.**                                       **Civil Action No. 4:05cv161**

**DR. FRANCIS J. HARVEY, SECRETARY,**
**DEPARTMENT OF THE ARMY,**
        **Defendant.**

## ORDER AND OPINION

Presently before the court are defendant's "Motion to Dismiss and for Summary Judgment" and plaintiff's motion for a jury trial. After examination of the record, the court determines that the facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. For the reasons set forth herein, the court **GRANTS** defendant's motion, thereby terminating this matter in favor of the defendant. Additionally, because defendant's dispositive motion is granted, plaintiff's motion for a jury trial is deemed **MOOT**.

### I. Procedural History

The motion before the court arises out of an employment discrimination lawsuit filed on December 5, 2005, by pro se plaintiff, Cynthia Williams. Plaintiff's complaint alleges that defendant, Francis Harvey, as representative for the Department of the Army, discriminated against plaintiff by preventing her from freely exercising her religion and by terminating her employment as a civilian security guard at Fort Eustis Army base based on her sex and the fact that plaintiff filed an EEO complaint. On May 2, 2006, defendant filed the instant motion to

dismiss and motion for summary judgment.  Defendant's motion relied on multiple evidentiary

exhibits, with defendant's primary source of evidence being sworn testimony of several

individuals, including plaintiff, that was taken shortly after plaintiff's termination.[1]  Thereafter,

plaintiff filed a reply memorandum in opposition to summary judgment and defendant filed a

rebuttal.  Although plaintiff's memorandum repeatedly provided cites to the testimony from the

administrative investigation, plaintiff failed to provide the court with copies of the pages that she

was citing to.  In recognition of plaintiff's pro se status, on June 28, 2006, the court issued an

Order providing plaintiff additional time to submit to the court excerpts of the sworn testimony

on which she relied.  Furthermore, because defendant provided sworn testimony in support of

summary judgment, the court warned plaintiff that if she failed to submit such evidence the court

would rule on defendant's motion "without the benefit of reviewing the testimony cited by

plaintiff" (June 28, 2006 Order).  On July 10, 2006, plaintiff provided a supplement to the court;

however, such supplement failed to provide numerous excerpts of testimony cited by plaintiff in

her brief.  Additionally, on June 12, 2006, plaintiff filed, subject to defect, a request for a jury

trial.

## II.  Factual Background

Pro se plaintiff Cynthia Williams was hired as a security guard on May 20, 2002, in the

law enforcement branch of the Provost Marshal's Office at the Fort Eustis United States Army

---

[1] The sworn testimony was taken during the investigation of plaintiff's complaint by the
Department of Defense, Civilian Personnel Management Service, Office of Complaint
Investigations.  The investigation was conducted on August 8, 2003, approximately five months
after plaintiff was terminated.  The resulting transcript was over 300 pages long and documented
the testimony of plaintiff, several coworkers, and several supervisors.  For ease of reference, the
court will refer to such sworn testimony as "(Test.)" followed by the page number.

base.  Plaintiff's employment at Fort Eustis was subject to a one year probationary period (Pl.

Reply 2).  While working at Fort Eustis, plaintiff contends that on several occasions she was

discriminated against based on her race (African-American), sex (female), religion (Christian),

and the fact that she filed an EEO complaint.[2]

During the course of plaintiff's employment, her co-workers used obscene and indecent

language (Pl. Reply 2).  Plaintiff both directly confronted several co-workers about the language

she found to be offensive and complained to her supervisors about the inappropriate language.

Plaintiff contends that the obscene language was "severe and pervasive" and created a hostile

work environment (Pl. Reply 2-3).  Although plaintiff contends that the language was directed

toward her based on her religion and sex, plaintiff fails to support such contention in any way as

she fails to provide a single example of what offensive language was used or provide an account

illustrating that the foul language was in fact directed at her.

Related to plaintiff's contention that obscene language created a hostile work

environment is an allegation of discrimination resulting from the fact that plaintiff was instructed

not to read her Bible at work.  On or around January 26, 2003, plaintiff was working as the desk

monitor at the security gate, a role that required her to monitor numerous screens displaying

images from security cameras.  Plaintiff, while on break, but still sitting in front of the monitors,

started reading her Bible (Pl. Reply 4).  Soon thereafter, plaintiff was approached by Sergeant

Saylor who asked why she was reading on post and plaintiff informed the Sergeant that she was

---

[2] The generalized facts pertinent to plaintiff's claims are set forth in this section. However, due to the nature of plaintiff's claims and the fact that plaintiff makes numerous factual assertions that are either undermined by the record before the court, or not substantiated by the record or any other evidence or inference, the facts are discussed in more detail in conjunction with the legal analysis sections that follow.

on break.  Nevertheless, the Sergeant reported plaintiff to her supervisor, Charles Bielling, and the following day Bielling posted a memorandum indicating that reading materials were not allowed at the Military Police Desk (Pl. Reply 4).  The memo also stated that when assigned to monitor the cameras, guards are required to take their breaks in the break room which is out of public view (Def. Rebuttal Ex.2).  At the time that plaintiff was informed by Sergeant Saylor that she was not supposed to be reading at the camera monitoring station, the male desk sergeant who was in charge of monitoring the radio was reading a magazine and was not instructed to stop (Pl. Reply 4; Test. 193-94).

The next series of events pertinent to plaintiff's lawsuit involve plaintiff's work schedule and her desire to avoid working on Sundays in order to attend church services that overlapped with her Sunday shift.  Plaintiff admits that when she applied for the security guard position at Fort Eustis she was aware that the position entailed rotating shifts which might include evenings, weekends, and holidays; specifically, plaintiff admits under oath that prior to accepting the job she realized that she would be required to work some Sundays but that she nevertheless accepted the position (Test. 25-26).  During plaintiff's first six months of employment there were no issues as plaintiff always had Sundays off; however, when plaintiff's schedule changed requiring her to work on Sundays, she immediately sought out management to discuss her dissatisfaction with the new schedule (Test. 27-28, 31).  While speaking with management, plaintiff learned that she was able to request leave on Sundays, although leave was not guaranteed, and plaintiff thereafter began taking leave or using sick days to avoid working on Sundays (Test. 29-30; 38-39).  Although plaintiff  never actually worked a Sunday at Fort Eustis, she contends that her employer should have rearranged her schedule in order to permit her to worship in the way that

she was accustomed to and that she was harmed by having to use her leave (Test. 33, 38-39, 45).

The final group of facts pertinent to the instant matter involve plaintiff's termination and defendant's proffered justification for such termination.  On February 20, 2003, in preparation for a visit to Fort Eustis by the Chief of Staff of the Army, the Army's most senior commissioned officer and member of the Joint Chiefs of Staff, the entire guard force, including plaintiff, were asked to clean up around the welcome center and guard gate at Fort Eustis.  Specifically, numerous guards were instructed to sweep up sand to improve the appearance of the entrance area.  The undisputed facts establish that plaintiff did not sweep after being told to do so by a supervisor; rather, plaintiff explained that she needed to obtain approval from her union before she would perform such task (Test. 75).[3]  Plaintiff was then reassigned to another area of duty while she was waiting for union approval; however, before such approval was obtained, plaintiff was instructed to sweep by a different supervisor and plaintiff again indicated that she would not sweep until she received authorization from the union (Test. 260).  Later that day, plaintiff was notified that she was being recommended for termination based on her decision not to sweep and on March 3, 2006, plaintiff was terminated (Def. M. S.J. Ex.7).

### III.  Standard of Review

A complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of

---

[3] For the purposes of this motion, the court considers all facts in a light most favorable to plaintiff and this includes plaintiff's version of the events on February 20, 2003.  Although the court recognizes that plaintiff never "refused" to sweep, plaintiff's version of events is an exercise in semantics; that is, she was told that she had to sweep and she indicated that she would not sweep until she received union approval.  Although the court may use the term "refused" for lack of a better word, the court recognizes that plaintiff did not indicate that she would not sweep, but rather, indicated that she needed to obtain union approval prior to sweeping.

facts in support of [her] claim which would entitle [her] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989).  As the court's role at the 12(b)(6) stage is to test the "legal sufficiency of the complaint, and not the facts in support of it," the court must "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." Eastern Shore Markets, Inc. v. J.D. Associates Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000) (citations omitted).  While the court must view the facts in the light most favorable to the plaintiff, the court is not bound with respect to the complaint's legal conclusions. Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir. 1991).  Furthermore, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Markets, 213 F.3d at 180.

Summary judgment is appropriate when the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985); Fed. R. Civ. P. 56(c).  Although the initial burden obviously falls on the moving party, once the movant has properly filed evidence supporting summary judgment, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts in the form of exhibits and sworn affidavits illustrating a genuine issue for trial. Celotex, 477 U.S. at 322-24; Cray Communications, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir. 1994).  In other words, while the movant carries the burden to show the absence of a genuine issue of material fact, when such burden is met, it is up to the non-movant to establish the existence of such an issue. See Celotex, 477 U.S. at 322-23 ("[T]he plain

language of Rule 56(c) <u>mandates</u> the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") (emphasis added).

Furthermore, summary judgment is not reserved for situations where no factual issues are in dispute; rather, to find against the moving party the court must find both that <u>material</u> facts are in dispute and that the disputed issues are <u>genuine</u>.  Fed. R. Civ. P. 56(c).  Disputed facts are "material" if they are necessary to resolving the case, and for issues to be "genuine" they must be based on more than speculation or inference.  <u>Thompson Everett, Inc. v. National Cable Advertising, L.P.</u>, 57 F.3d 1317, 1323 (4th Cir. 1995); <u>see</u> <u>Hux v. City of Newport News, Va.</u>, 451 F.3d 311, 315 (4th Cir. 2006) ("[T]he genuineness and materiality requirements express the sound proposition that litigation for its own sake is not a judicious use of resources.").  If the moving party advances evidence suggesting that there is not a genuine and material dispute, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," as the existence of a scintilla of evidence is insufficient to defeat a motion for summary judgment.  <u>Matsushita</u>, 475 U.S. at 586; <u>Catawba Indian Tribe of S.C. v. South Carolina</u>, 978 F.2d 1334, 1339 (4th Cir. 1992).  Furthermore, summary judgment is not viewed as a "disfavored procedural shortcut, but rather [is] an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  <u>Celotex</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## IV.  Analysis

Plaintiff's complaint is in the form of a letter; however, it adequately sets forth plaintiff's claims of discrimination based on plaintiff's sex and the fact that she filed an EEO complaint.

As discussed below, plaintiff advances five arguments in her complaint and memorandum in opposition of summary judgment; such claims are: (1) plaintiff was not promoted based on her sex and race; (2) plaintiff was subjected to a hostile work environment based on her co-workers continuos use of obscene language; (3) plaintiff was harassed or subject to disparate treatment for reading her Bible at work; (4) defendant failed to accommodate plaintiff's religious beliefs as she was required to work on Sundays; and (5) plaintiff was wrongfully discharged based on her sex and the fact that she filed an EEO complaint.  Plaintiff contends that there are material issues of fact relating to such claims and that pursuant to the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), she has advanced sufficient facts to withstand summary judgment.  The Fourth Circuit has recently recognized that "summary judgment standards mesh comfortably with the <u>McDonnell Douglas</u> framework" and that although the courts are duty-bound to "examine employment decisions for unlawful discrimination" such duty "coexists with the duty not to invade the province of" employers' business decisions.  <u>Hux</u>, 451 F.3d at 315.

As set forth in detail below, plaintiff's first three claims are dismissed for failure to state a claim on which relief can be granted because such claims are not properly before this court.  Furthermore, defendant's motion for summary judgment successfully disposes of plaintiff's fourth and fifth claims, as well as plaintiff's second and third claims if they were not procedurally infirm.  This matter is therefore terminated in its entirety in favor of defendant.

### A.  Failure to promote

Plaintiff's failure to promote claim fails as a matter of law and must be dismissed, as the record plainly establishes that plaintiff failed to properly exhaust her administrative remedies on

such claim.[4]  In a letter dated March 26, 2003, an Equal Employment Opportunity Officer from

the Department of the Army informed plaintiff that the EEO would investigate three of her five

claims, that one claim would be held in abeyance pending review by the Merit Systems

Protections Board, and that the final claim, plaintiff's failure to promote claim, was being

dismissed as it was not timely filed (Def. M. S.J. Ex.4).  Plaintiff composed a letter in response,

stating that plaintiff believed that the dismissal of her failure to promote claim was incorrect

(Def. M. S.J. Ex.5).  The EEO responded with an amended notice letter providing more detail

with respect to the untimeliness of plaintiff's failure to promote claim (Def. M. S.J. Ex.6).

Specifically, the amended letter explained that plaintiff admittedly became aware of her non-

selection for promotion no later than November 5, 2002; however, plaintiff failed to contact the

EEO until January 23, 2003, 79 days after the alleged discriminatory event and more than a

month beyond the deadline of the 45-day notice period established by federal regulation.

        The EEOC has promulgated regulations implementing Title VII with respect to federal

employees and such regulations establish that plaintiff's failure to promote claim is untimely.

See generally, 29 C.F.R. § 1614 (Federal Sector Equal Employment Opportunity).  Specifically,

federal regulation requires that:

> (a) Aggrieved persons who believe they have been discriminated against on the
> basis of race, color, religion, sex, national origin, age or handicap must consult a
> Counselor prior to filing a complaint in order to try to informally resolve the matter.
>     (1) An aggrieved person must initiate contact with a Counselor within 45 days

---

[4] The record contains virtually no facts related to plaintiff's non-promotion claim.
Plaintiff does explain in her reply brief that she applied for promotion in November of 2002 and
that four males were promoted, three white and one black; however, plaintiff provides absolutely
no details as to who was promoted, what the selection criteria was, who applied, etc. (Pl. Reply
2).  Although plaintiff contends that an EEO counselor concluded that plaintiff had "equal and in
several cases more education and experience than the individuals selected" for promotion,
plaintiff fails to provide an affidavit or any other exhibit supporting this assertion (Pl. Reply 2).

of the date of the matter alleged to be discriminatory or, in the case of
personnel action, within 45 days of the effective date of the action.

29 C.F.R. § 1614.105 (emphasis added).  Because federal regulation requires that plaintiff initiate

contact with a counselor within 45 days of the discriminatory event or personnel action, yet

plaintiff waited 79 days, plaintiff's failure to promote claim is untimely and must therefore be

dismissed.  Zografov v. V.A. Medical Center, 779 F.2d 967, 969 (4th Cir. 1985) (finding that

failure to comply with the time limits set forth in the C.F.R. act to bar federal lawsuits because

failure to comply with such limits constitutes a "failure to exhaust administrative remedies");

Pueschel v. Veneman, 185 F. Supp. 2d 566, 568-69 (D. Md. 2002) ("Prior to seeking relief for

Title VII claims in court, a federal employee must timely exhaust all available administrative

remedies . . . [including] counseling . . . within 45 days of the date of the matter alleged to be

discriminatory . . . .  The failure to comply with this rule precludes the filing of a formal

complaint with the agency . . . and precludes a discrimination claim in federal court.") (citations

omitted).  Although the C.F.R. recognizes certain scenarios where the 45-day time limit may be

extended, 29 C.F.R. § 1614.105, and the Fourth Circuit recognizes that such period is subject to

equitable tolling, Zografov, 779 F.2d at 969, plaintiff has failed to advance any facts establishing

that such period was extended or should be equitably tolled.[5]  Therefore, plaintiff's failure to

promote claim is dismissed based on plaintiff's failure to exhaust her administrative remedies.


_____**B.  Hostile Work Environment / Disparate Treatment from: (1) Continuous
      Obscene and Indecent Language; and (2) Reprimand for Reading the Bible.**

---

[5] Plaintiff's March 31, 2003, letter to the EEO does contend that the "time limits were
extended/waived by the agency" (Def. M. S.J. Ex.5).  However, as explained to plaintiff in the
EEO's response, the regulations pertaining to an extension of the duration of counseling and
plaintiff's agreement to extend such period in no way impacts the requirement that plaintiff
timely initiate contact with an EEO counselor.

Plaintiff's claims that she was subjected to a hostile work environment due to her co-workers' continuous use of obscene language and that she was reprimanded for, and thereafter prohibited from, reading a Bible at work are dismissed as plaintiff failed to raise such claims in her complaint.  In the alternative, even if such claims were deemed properly raised, such claims would fail to survive defendant's summary judgment motion.

**1. Failure to Raise Claims in the Complaint**

Plaintiff's complaint, filed on December 5, 2005, sufficiently sets forth plaintiff's claims that she was discriminated against in that she was not promoted, was not permitted to attend church services, and was ultimately terminated based on her sex and filing of an EEO complaint. However, although the record before the court establishes that plaintiff pursued administrative relief on additional grounds, such claims were not alleged in plaintiff's complaint.  Notably absent from the complaint is any mention of co-workers using obscene language or the fact that plaintiff was allegedly singled out for reading the Bible at work.  Although plaintiff attempts to raise such claims in her reply memorandum in opposition to summary judgment (Pl. Reply 1), plaintiff at no time sought to amend her complaint and is not permitted to raise new grounds for relief in a reply brief.  The court is sensitive to the fact that plaintiff is proceeding pro se and that "trial courts are encouraged to liberally treat procedural errors made by pro se litigants, especially when a technical or arcane procedural rule is involved."  Bauer v. C.I.R., 97 F.3d 45, 49 (4th Cir. 1996).[6]  However, although this court does not expect a pro se plaintiff to perfectly comply with

---

[6] The court's willingness to afford lenience to the pro se plaintiff was already amply displayed in this matter as the court previously excused plaintiff's failure to attach exhibits to her memorandum.  Although plaintiff was provided with a Roseboro notice the court did not rule on defendant's motion in the absence of plaintiff's cited exhibits, but rather, afforded the pro se plaintiff fifteen additional days to supplement the record with the documents cited in her brief.

all procedural rules, "[t]he right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law." <u>Birl v. Estelle</u>, 660 F.2d 592, 593 (5th Cir. 1981). Requiring that all plaintiffs, including <u>pro se</u> plaintiffs, set forth in their complaint the grounds on which they are proceeding is not "technical" or "arcane," but rather, is an elementary requirement that is a necessity for defendants to be able to mount a defense.[7] Therefore, the court declines to consider plaintiff's claims raised for the first time in her memorandum in opposition to summary judgment; rather, such claims are dismissed as they are not properly before the court.

### 2.  If Properly Before the Court, Summary Judgment is Mandated

In the alternative, even though plaintiff's complaint fails to mention a single fact, legal claim or ground for relief that in any way suggests that she intended to proceed against defendant based on claims that she was subjected to a hostile work environment, or banned from reading her Bible at work, the court nevertheless briefly discusses such claims, and the reasons such claims fail to withstand defendant's motion for summary judgment. First, with respect to plaintiff's allegations of a hostile work environment caused by offensive language, in order to succeed plaintiff must establish: (1) unwelcome conduct; (2) the unwelcome conduct was based on plaintiff's religion or sex; (3) the conduct was so pervasive or severe that it altered her conditions of employment creating an abusive atmosphere; and (4) there is a basis for imputing

---

[7] The court recognizes that the procedure governing amending a complaint may be foreign to a <u>pro se</u> plaintiff and may require the court to exercise leniency with respect to <u>pro se</u> requests to amend. However, here, although plaintiff underwent an administrative process prior to filing her lawsuit that lasted over two and half years, plaintiff failed to include several grounds for relief in her complaint and at no point sought to amend her complaint to include such claims. Rather, plaintiff attempted to raise new grounds for relief in response to defendant's dispositive motion filed nearly five months after plaintiff filed her complaint. The court sees no unfairness to plaintiff in declining to entertain such untimely claims.

liability on her employer.  Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190 (4th Cir. 2004).  Here, even considering the facts in a light most favorable to plaintiff, plaintiff is unable to establish either the second or third element.  Considering the second element, plaintiff has failed to even advance unsubstantiated facts suggesting that the offensive language was directed at her based on her sex or religion.  See Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 261 (4th Cir. 2001) ("The critical issue in this context is whether members of one [religion or] sex are exposed to disadvantageous terms or conditions of employment to which members of the other [religion or] sex are not exposed.") (citations omitted).  Sworn testimony provided to the court by both parties

establishes that although swearing may have been a daily occurrence at plaintiff's workplace, such language, while admittedly offensive, was never even directed at plaintiff, let alone at her sex or religion.  Rather, the offensive language was used in nearly all circumstances, including in front of women, men, and both civilian and military supervisors, and plaintiff merely overheard the use of such language (Test. 256-57; 285-86).  For example, an excerpt of sworn testimony submitted by plaintiff regarding the offensive language stated:

> Q: [W]ere there any females on your shift?
> A: One.  We had one, Kristen.
> Q: And so this language went on with her, it went on with the males?
> A: Yes.
> Q: Everyone?
> A: Everyone.

(Test. 285).  Likewise, in response to a question about plaintiff's allegation of constant profanity in the workplace, one of plaintiff's co-workers stated:

> At the time before Ms. Williams was employed with us, the profanity was on a
> regular basis, including myself.  She got employed with us, and she informed me
> at the building, when she heard me using profanity, that she didn't appreciate that

13

> type of language.  I immediately did my best to ensure that I didn't offend her anymore.

(Test. 307).  Furthermore, one of plaintiff's supervisor's explained under oath:

> There was a problem with swearing in our unit.  There was a lot of cussing that was happening. . . . And [after the Provost Marshal indicated that it was not acceptable] we tried – sometimes it still slipped, because sometimes it happens.  But for the most part, I, myself tried to do better and tried to make my soldiers.  But occasionally, I did still slip.

(Test. 256-57).  Although such testimony, provided by three different individuals, establishes that the offensive language was pervasive, it also shows that the language was generalized swearing, not directed verbal attacks based on sex or religion; plaintiff has not submitted an affidavit nor any other evidence suggesting that the profane language was directed at her because she was a woman, or because she was a Christian.[8]  Therefore, plaintiff's claim, even if it were properly before the court, fails to overcome sworn testimony in the record establishing that the offensive language at issue was merely the general use of profanity that plaintiff found offensive.

Likewise, considering the third element, plaintiff fails to establish that the offensive language was so severe as to alter plaintiff's condition of employment.  Although the court assumes that plaintiff was subjected to profane language nearly every day, the fact that such profanity appears to have been almost standard practice suggests that a reasonable person would not be sufficiently offended to meet the standard set forth in Title VII.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (stating that "mere utterance of an epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to

---

[8] In plaintiff's reply brief she states: "Such offensive language was directed toward Complainant due to her religion and sex . . . ." and includes a cite to a transcript page that was not attached to her brief.  However, even after this court afforded plaintiff an additional opportunity to submit such exhibit, plaintiff failed to do so.  Therefore, there is no evidence before the court suggesting that plaintiff was ever targeted based on her sex or religion.

implicate Title VII"; rather, the environment must be so hostile or abusive that the plaintiff

subjectively perceives herself as abused and a "reasonable person" in plaintiff's position would

feel the same) (citations omitted).  Although the court does not question the frequency of the foul

language at plaintiff's workplace, plaintiff has failed to advance any evidence documenting the

comments made or even offering the bald conclusion that the comments were so offensive that a

reasonable person's work would have been affected.  Hopkins v. Baltimore Gas and Elec. Co., 77

F.3d 745, 754 (4th Cir. 1996) ("While we do not approve of [plaintiff's supervisor's] apparent

willingness to offend and provoke employees with his ambiguously sexual innuendos, Title VII

was not designed to create a federal remedy for all offensive language and conduct in the

workplace."); Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (stating

that the court must consider the totality of the circumstances, including the severity of the alleged

statements and whether they were physically threatening, humiliating, "or a mere offensive

utterance").

Here, the only evidence supplied by plaintiff documenting the details of the alleged

offensive language was a statement by Joey Tisdale, an Fort Eustis guard, who stated that the

language didn't bother him because he didn't pay it much attention and because "it wasn't

personal" (Test. 285).  Tisdale did recognize that the individuals using the foul language

sometimes went "a little too far with some of the things they were saying, you know, some of the

words they were saying" and that he thought such language "would be offensive to a person, you

know, a very religious person" (Test. 285).  However, assuming that Tisdale is correct, the fact

that such language would be offensive to a very religious person fails to carry plaintiff's burden

as "mere offensive utterances" are not enough to establish a hostile work environment claim.

Furthermore, although the court is tasked with considering "the severity of the alleged statements," <u>Hopkins</u>, 77 F.3d at 753, here, plaintiff has failed to even inform the court what the alleged statements were.

As a result, plaintiff's hostile work environment claim fails to survive defendant's motion for summary judgment.  The sworn testimony provided to the court establishes that "cussing" and "swearing" were rampant in the workplace; however, such language was occurring prior to plaintiff's employment, occurred in front of all types of personnel, did not offend other employees and "wasn't personal."  Plaintiff does not contest such testimony nor provide any facts, supported or unsupported, suggesting that such language targeted her sex or religion or that it was sufficiently pervasive to create an abusive atmosphere.

Second, considering plaintiff's claim that she was harassed and unlawfully discriminated against for reading her Bible at work, plaintiff fails to establish any nexus whatsoever between her religion and her employer's actions prohibiting <u>all employees</u> tasked with monitoring the video screens at the guard gate from reading <u>any</u> materials.  Plaintiff's discrimination claim is based on two arguments: first, that she was on break when she was reading her Bible; and second, that other employees working in the guard gate were not prohibited from reading non-religious materials.  Although plaintiff has not provided the court with an affidavit or any other exhibit supporting such assertions, even accepting such facts as true, uncontroverted evidence submitted by defendant establishes that plaintiff's discrimination claim cannot survive summary judgment.

Sworn testimony provided by defendant establishes that on the day that plaintiff was told not to read her Bible she was reading at the guard desk where she was assigned to monitor

security cameras (Test. 190).  Even assuming that plaintiff was "on break" at such time, she was told that it was improper for her to read at the desk where the monitors were, and that she should take her break in the break room which was "out of public view" (Test. 191).   The fact that plaintiff was reading in public view in front of the monitors is what caused the issue, not the fact that what she chose to read was the Bible (Test. 192).  Furthermore, the rule prohibiting reading was not created in order to prevent plaintiff from reading the Bible; rather, such rule was always in effect, as evidenced by the fact that one of plaintiff's male co-workers had also been "counseled" for violating such rule (Test. 190, 192).  Because plaintiff was the second guard discovered reading in front of the monitors, one of plaintiff's superiors found it necessary to post a memo informing all guards that <u>all reading materials</u> were prohibited while monitoring the cameras (Test. 190-92).

Similarly, plaintiff's claim that she was singled out for reading the Bible while other individuals were permitted to read non-religious materials is also undermined by sworn testimony, as the "other" individuals plaintiff refers to were performing different job functions, that is, they were not in charge of monitoring the security cameras.  Specifically, plaintiff references a desk sergeant responsible for monitoring the radio who was allowed to read a magazine while at his post.  However, monitoring the cameras, not the radio, is the "main function" for the gate guards being at the desk and the desk sergeant operates under a different supervisor and different standard operating procedure than the guard responsible for monitoring the gate (Test. 194).  As plaintiff's claim relies on comparing herself to individuals not similarly situated, and all employees that were similarly situated were required to follow the same blanket content neutral rule banning all reading materials from the camera monitoring station, plaintiff's

claim fails to survive summary judgment.[9]

_____**C.   Failure to Accommodate Plaintiff's Religious Beliefs**

Plaintiff next contends that defendant failed to accommodate her religious beliefs as she was required to work on Sundays.  To establish a prima facie case of failure to accommodate, plaintiff must establish: (1) a bona fide religious belief conflicting with an employment requirement; (2) that she informed her employer of such belief and requested an accommodation; and (3) that she was disciplined for failing to comply with the employment requirement in conflict with her belief.  Chalmers  v. Tulon Co. of Richmond, 101 F.3d 1012, 1019 (4th Cir. 1996) (quoting Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir.1985)).   Plaintiff's failure to accommodate claim fails as a matter of law because plaintiff fails to establish the second and third elements.[10]

_____

[9] It should be noted that plaintiff was never disciplined for the allegedly disparate treatment relating to reading her Bible (Test. 192). Furthermore, plaintiff failed to suggest that she was prohibited from reading her Bible in the break room while she was on break.

[10] Plaintiff may also fail to establish the first element.  Although plaintiff identifies her faith to be Christian and Sunday is the traditional Christian Sabbath, plaintiff admits that her religion does not require her to attend services every Sunday nor does it require that plaintiff attend services at a particular time of day (Test. 22-24).  Rather, plaintiff prefers, but is not required, to attend the noon Sunday service at a specific church (Test. 24).  Plaintiff admits both that she could have attended a different church, or potentially attended a service at a different time at her preferred church; however, the gospel service held at noon on Sundays was plaintiff's favorite service (Test. 24).  It appears, therefore, that it was merely plaintiff's preferences that conflicted with an employment requirement, as plaintiff admits that she took the guard position knowing that she would have to work some Sundays (Test. 26).  Compare E.E.O.C. v. Ithaca Industries, Inc., 849 F.2d 116, 117 (4th Cir. 1988) (stating that plaintiff "has been a member of the Church of God since 1977 and believes that he cannot work on Sunday because it would violate his religious beliefs"); E.E.O.C. v. J.P. Stevens and Co., 740 F. Supp. 1135, 1136 (M.D.N.C. 1990) ("Each of the plaintiffs is a believer in the 'Holiness' religious sect . . . [and] [a]s part of their beliefs, each plaintiff claims that working on Sundays is a violation of his or her personal religious tenets.").

Turning to the second element, at trial plaintiff bears the burden of establishing "that she informed her employer that her religious needs conflicted with an employment requirement and asked the employer to accommodate her religious needs." <u>Chalmers</u>, 101 F.3d at 1019; <u>see</u> <u>E.E.O.C. v. J.P. Stevens and Co.</u>, 740 F. Supp. 1135, 1137 (M.D.N.C. 1990) (finding employee failed to establish a prima facie case of failure to accommodate because plaintiff never informed his employer of his religious beliefs).  Here, plaintiff states under oath that when she applied for the security guard position the "condition of employment" that she signed required her to work rotating shifts which may include evenings, weekends, and holidays (Test. 25-26).   Plaintiff further admits that she realized that she would have to work some Sundays, but plaintiff took the job anyway because she liked working with people and knew this job would create such opportunity (Test. 26).  Although plaintiff knew from the outset that her job required that she work rotating shifts, including weekends, as soon as plaintiff's schedule required her to work Sundays, plaintiff indicated her unwillingness to work what she had previously agreed to, and she informed her manager that she intended to take leave on the Sundays she was scheduled (Test. 27, 32).  Furthermore, the following exchange during plaintiff's testimony highlights the fact that even when plaintiff spoke with her manager about her dislike of the new schedule, she never requested a shift change, or any other accommodation:

> Q: And what accommodation did you request from management?
> A: To have – actually, when I ended up filing an EEO complaint and everything, even if I
>    – even if I could have gotten a couple of hours off, I would, you know – that would
>    have helped some, or either to get the Sunday off with another day during the week.
> Q: Did you request a different work schedule from management?
> A: No, ma'am.
> Q: Did you ask them about switching with other employees?
> A: Everyone was rotating, so, no ma'am.
> . . .
> Q: Were you the only Christian that had to work on Sundays?

A: No, ma'am.

. . .

Q: So . . . you went to speak to [a supervisor]?

A: Yes.

Q: And what did you tell him?

A: . . . I spoke to him about my fears and concerns about working on Sunday.  And I stated that if I had to, I would take leave, because that's how strongly I felt about worshiping the way I was accustomed to worshiping.

Q: And did you request that he allow you to change your tour of duty?

A: No, ma'am.

Q: Why not?

A: Everyone – because everyone was rotating.  I didn't want to inconvenience anyone else.  Everyone was rotating.

Q: . . . [W]hat did you expect [your supervisor] to do?

A: I was hoping to be afforded time off to worship, at least two hours on the Sunday to worship in the way I was accustomed to.  Or perhaps, like I said, being able to be off on Sunday and maybe perhaps taking another day.

Q: Did you suggest that to [your supervisor]?

A: I don't believe so.  No, ma'am.

(Test. 29-32).  Based on such statements, as well as plaintiff's admissions that she was aware that she may be required to work some Sundays but refused to do so once scheduled, plaintiff is unable to establish that she sought and was denied a religious accommodation.

Briefly addressing the third required element of a prima facie case, plaintiff also fails to establish that she was disciplined or suffered an adverse employment action for failing to comply with the employment requirement that she work on Sundays.  Notably, plaintiff admits that she was granted leave on Sundays every time she requested it; furthermore, plaintiff admits that she also avoided working on Sundays by calling in sick in order to attend church services (Test. 38-39).  However, plaintiff does not allege that she was terminated based on her failure to work Sundays; rather, she alleges that she was wrongfully terminated based on her sex and for filing an EEO claim.  When asked how plaintiff was harmed if she never worked on Sunday, plaintiff stated that "if I hadn't taken the leave, I would not have been able to worship in the way that I

was accustomed to" (Test. 45).  When pressed as to how such constituted harm, plaintiff stated

that she was harmed "[b]y taking days when I feel that it was unnecessary for me to do that"

(Test. 45).  Plaintiff's opinion that she "feels" that it was unnecessary to use her leave days fails

to establish that she suffered an adverse employment action for failing to comply with her

employer's requirements.  See Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999) ("[D]ischarge,

demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced

opportunities for promotion [are] the typical requirements for a showing of an 'adverse

employment action.'"); Ali v. Alamo Rent-A-Car, Inc., 8 Fed. Appx. 156, 159 (4th Cir. 2001)

(unpublished) ("[A] Title VII plaintiff claiming discrimination on the basis of religion must

allege adverse employment action in order to survive a motion to dismiss . . . .").

        In the alternative, assuming that plaintiff successfully established a prima facie case, the

court must then consider whether defendant provided a "reasonable accommodation" of

plaintiff's religious practices, or whether no reasonable accommodation was possible.  Ansonia

Bd. of Educ. v. Philbrook, 479 U.S. 60, 67-68 (1986).  Accommodations are deemed

unreasonable if they cause an employer undue hardship, that is, they result in "'more than a de

minimis cost' to the employer."  Id. at 67 (quoting Trans World Airlines, Inc. v. Hardison, 432

U.S. 63, 74 n.9 (1977)).  In Philbrook, the Supreme Court concluded that an employer is not

required to adopt an accommodation proposed by an employee nor required to prove that such

request would create an undue hardship; rather, an employer must offer a reasonable

accommodation of its choosing and once it has done so the court's inquiry must end.  Id. at 68;

see Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996) ("An employer is not obligated

to provide an employee the accommodation [s]he requests or prefers, the employer need only

provide some reasonable accommodation."); Brener v. Diagnostic Center Hospital, 671 F.2d 141,

146 (5th Cir. 1982) ("Although the statutory burden to accommodate rests with the employer, the

employee has a correlative duty to make a good faith attempt to satisfy his needs through means

offered by the employer. A reasonable accommodation need not be on the employee's terms

only."). Considering what qualifies as a "reasonable" accommodation, multiple courts have

found that a policy permitting employees to trade shifts provides, in most circumstances, a

reasonable accommodation. See, e.g., Smith v. Pyro Min. Co., 827 F.2d 1081, 1088 (6th Cir.

1987) ("Undoubtedly, one means of accommodating an employee who is unable to work on a

particular day due to religious convictions is to allow the employee to trade work shifts with

another qualified employee."); J.P. Stevens and Co., 740 F. Supp. at 1138-39 (finding that the

plaintiffs' ability to solicit other employees to swap shifts would have been a reasonable

accommodation absent the plaintiffs' sincere beliefs that inducing another to work on the

Sabbath was also a sin).

Here, the record establishes that plaintiff was offered more than one reasonable

accommodation and therefore, she cannot succeed on her failure to accommodate claim. First,

defendant had a policy in place which permitted plaintiff to switch shifts with other employees as

long as the change would not result in overtime (Test. 104).[11] Second, after plaintiff expressed

her dislike of the new schedule to Benny Connor, the Chief of Admin and Law Enforcement and

one of plaintiff's superiors, she contacted her union and in mid-February, management and the

union met with plaintiff and offered to accommodate her by allowing her to change shifts "to

either a swing shift or a midnight shift that would be able to accommodate Sundays off";

---

[11] Plaintiff was plainly aware of such policy as plaintiff's testimony indicates that she
previously took advantage of the policy and switched shifts with another individual (Test. 28).

however, plaintiff declined the offer to change shifts (Test. 98-100).  Such sworn testimony, to which plaintiff fails to advance any evidence in opposition, establishes that plaintiff was offered reasonable accommodations, both in that she was permitted to swap shifts with other employees and that she was given the opportunity to change the hours she worked to permit her to attend her desired religious services.  Although plaintiff's preferred solution was that she stay on day shift and either never work Sundays or always be permitted to leave two hours early to attend services, as stated by the Supreme Court in Philbrook, employers need not adopt employee's plan nor establish that such proposal would create an undue hardship; rather, once a court deems the employer to have offered a reasonable accommodation, the inquiry ends.  Philbrook, 479 U.S. at 68; Cary v. Carmichael, 908 F. Supp. 1334, 1347 (E.D. Va. 1995) (recognizing that there is a "burden upon the employee" to attempt to work out a solution with an employer and the plaintiff in Cary had not done so as he "never made his position clear, nor did he ever express any possible alternative[s] . . . .").  As a result, even if plaintiff had set forth a prima facie case, plaintiff's failure to accommodate claim must be denied as defendant has affirmatively established that plaintiff was offered at least one reasonable accommodation.

### D.  Termination Based on Plaintiff's filing of an EEO Complaint.

Plaintiff's final claim is that she was wrongfully terminated based on both her sex and in retaliation for previously filing an EEO complaint against her superiors.  In order to survive defendant's dispositive motion, plaintiff may proceed in one of two ways: first, plaintiff may establish through ordinary principles of proof using direct or circumstantial evidence that her employer's decision to terminate her was motivated based on her sex or the fact that she filed an EEO claim.  See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir.

23

2004) (en banc).[12]  Second, plaintiff may advance her case by establishing a presumption of

discrimination or retaliation under the burden shifting framework set forth in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny.  To establish a prima facie case of

retaliation, plaintiff must show: "(1) that she engaged in protected activity; (2) that [her]

employer took adverse employment action against her; and (3) a causal connection existed

between the protected activity and the adverse action." McNairn v. Sullivan, 929 F.2d 974, 980

(4th Cir. 1991).  To establish a prima facie case of discrimination based on her sex, plaintiff must

show:  "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3)

she was performing her job duties at a level that met her employer's legitimate expectations at

the time of the adverse employment action; and (4) the position remained open or was filled by

similarly qualified applicants outside the protected class." Miles v. Dell, Inc., 429 F.3d 480, 485

(4th Cir. 2005) (quoting Hill, 354 F.3d at 285).[13]

---

[12]  The court does recognize that, despite a lack of direct evidence of discrimination, the plaintiff might have proceeded under a mixed-motive theory as the method of proof by which to state her claims.  A plaintiff proceeding under the mixed-motive theory must present sufficient direct or circumstantial evidence for a reasonable jury to conclude that gender discrimination or retaliation was a motivating factor for an adverse employment practice.  See Hill, 354 F.3d at 284-85 (4th Cir. 2004); Desert Palace Inc. v. Costa, 539 U.S. 90, 102 (2003).  Plaintiff, however, provides no analysis or support for proceeding under this theory nor does defendant discuss it. Accordingly, the court will not discuss plaintiff's claims under the mixed-motive theory.  The court does note, however, that plaintiff has presented no direct evidence of retaliation or discrimination and that plaintiff's circumstantial evidence is largely speculative; furthermore, the exhibits provided by plaintiff generally fail to support her direct or circumstantial allegations.

[13] In Miles, 429 F.3d at 485-89, the Fourth Circuit discusses at length the fourth prong of the prima facie case of discriminatory termination.  Ultimately, the opinion concludes that the court is "without the authority to dispense with the fourth prong" and that a plaintiff is "ordinarily" required to establish such prong in order to successfully set forth a prima facie case. However, the court does recognize that "whenever the plaintiff's evidence could be said to give rise to an inference of discrimination . . . it is permissible for a panel of the court to recognize exceptions to prong four for categories of cases that call for an exception." Id. at 488.

If plaintiff succeeds in presenting a prima facie case, an inference of discrimination arises, and defendant must then articulate a legitimate non-discriminatory reason for the challenged actions.  McDonnell Douglas, 411 U.S. at 802.  Defendant's burden "is one of production, not persuasion; it can involve no credibility assessment."  Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514 (4th Cir. 2006) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000)).  Once defendant provides such explanation, the presumption of discrimination is extinguished, and plaintiff must advance evidence establishing that defendant's justification was pretext for a discriminatory motivation.  Reeves, 530 U.S. at 142-43.  Plaintiff's burden of establishing pretext "merges with the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination."  Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981)).  Plaintiff cannot succeed in establishing pretext merely "by focusing on minor discrepancies that do not cast doubt on the [proffered] explanation's validity, or by raising points that are wholly irrelevant to it."  Hux v. City of Newport News, Va., 451 F.3d 311, 315 (4th Cir. 2006).

Here, plaintiff's brief argues that plaintiff has established prima facie cases of discrimination and retaliation and that there are material facts in dispute that prevent the court from deciding the case on summary judgment.  Defendant's brief assumes that plaintiff successfully established such prima facie cases, but argues that defendant has proffered a non-discriminatory reason for terminating plaintiff and that plaintiff is unable to rebut such proffered justification.  Assuming, as defendant has, that prima facie cases of discrimination and retaliation were established by plaintiff, a presumption of discrimination and retaliation arise and the court

must proceed to analyzing whether defendant proffered a non-discriminatory reason for plaintiff's termination.[14]  It is important to reiterate that defendant's burden "is one of production, not persuasion" and that the court must not conduct a "credibility assessment."  Warch, 435 F.3d at 514.  Here, defendant produces a legitimate justification for termination, stating that plaintiff was terminated for twice refusing to sweep in accordance with a direct orders from two separate supervisors.

As defendant has proffered a non-discriminatory explanation for plaintiff's termination, the presumptions of retaliation and discrimination are extinguished, and plaintiff must advance evidence establishing that defendant's explanation is merely "pretext."  Plaintiff's burden of proving pretext merges with the ultimate burden of establishing that plaintiff was terminated

_____

[14] The court notes that, if argued by the defendant, the court would likely have concluded that plaintiff failed to establish a prima facie case of discrimination based on her sex as plaintiff failed to advance evidence establishing that her job performance met her employer's legitimate expectations or that subsequent to her termination her job remained open or was filled by a male employee.  With respect to plaintiff's performance, defendant advances sworn testimony establishing that plaintiff's supervisors were concerned that she was abusing defendant's sick leave policy and plaintiff freely admits under oath that she was (Test. 38-39, 103).  Furthermore, although plaintiff relies on semantics to argue that she never refused a work assignment, the record plainly establishes that plaintiff was asked by two separate supervisors to help clean up the base by sweeping and that plaintiff indicated to both superiors that she would not sweep until she first received approval from her union (Test. 75).  Notably, plaintiff was still a probationary employee when she twice "refused" the directive to sweep.  As it is undisputed that plaintiff's job responsibilities included maintaining the cleanliness of the gate area, it appears that plaintiff, a probationary employee, was not satisfactorily performing her job.  See Warch, 435 F.3d at 514 (finding that considering whether an employee satisfied the "legitimate expectations" of her employer helps "to screen out those cases whose facts give rise to an inference of nondiscrimination, in other words, to eliminate the most common, nondiscriminatory reasons for the employer's conduct").  Likewise, plaintiff has not advanced any evidence suggesting that she was replaced by a male or that subsequent to her termination, her position was held open for a period of time.  Plaintiff also failed to argue that an exception applies such that a showing on the final prong of the prima facie case is not required.  As a result, it appears to the court that the plaintiff has failed to establish a prima facie case of sex discrimination; however, as defendant did not argue such and pro se plaintiff was not afforded an opportunity to rebut the same, the court will assume that plaintiff established a prima facie case of sex discrimination.

26

based on her sex or the filing of her EEO complaint.  See Mereish, 359 F.3d at 334.   When

considering whether plaintiff has established pretext, the court should not "second guess

workplace decisions" or permit plaintiff to proceed merely because she disagrees with an

employment decision; rather, plaintiff must "come forward with admissible evidence that is more

than self-serving opinions or speculation."  McCain v. Waste Management, Inc., 115 F. Supp. 2d

568, 574 (D. Md. 2000).  Here, in an attempt to establish pretext, plaintiff argues: (1) the timing

of her termination action strongly creates an inference of retaliation; (2) several other women

filed EEO complaints and were terminated shortly thereafter; (3) numerous male probationary

employees had more serious incidents of misconduct and were not terminated; and (4) she never

refused to sweep and was not insubordinate.  Considering each of plaintiff's contentions in turn,

the court concludes that plaintiff has failed to establish pretext or that a material fact exists with

respect to any of her allegations.

### 1.  Timing of Plaintiff's Termination

Plaintiff first argues that the timing of her termination strongly creates an inference of

retaliation.  Plaintiff states in her memo, although she fails to provide exhibits to support such

claim, that she was scheduled to have mediation on her EEO claims on February 26, 2003;

however, she was presented with a recommendation for termination on February 20, 2003, her

mediation was canceled, and she was issued a Termination Notice on March 3, 2003.  Although

the events described above were clearly close in time, plaintiff cannot carry her "ultimate

burden" of establishing that she was the victim of intentional discrimination merely by relying on

the fact that events she knowingly caused to occur were close in time to plaintiff's scheduled

mediation.  See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) ("Plainly, mere

knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee.").  Speculation alone is insufficient to establish pretext, especially when the speculation relies upon plaintiff's <u>voluntary choice</u> not to comply with a direct order issued by two separate supervisors on the Army base where plaintiff worked. The fact that plaintiff was terminated close in time to her scheduled mediation only establishes that plaintiff chose not to follow orders close in time to such mediation and is insufficient to establish pretext.

### 2. Female Co-workers Alleged Termination

Plaintiff's next contention is that a material fact exists with respect to her termination because several other female co-workers filed EEO complaints and were terminated shortly thereafter.  Although such evidence may provide circumstantial support for plaintiff's claim, plaintiff fails to provide any documentation, such as an affidavit or sworn testimony from the administrative investigation, establishing such fact.  Plaintiff's brief does provide cites to the testimony from the administrative record that purportedly support plaintiff's claim; however, plaintiff has not provided the court copies of such pages.  It should be reiterated that the court previously issued an order solely for the purpose of permitting the <u>pro se</u> plaintiff a second opportunity to supply the court with such supporting documentation.  As stated above, plaintiff, the non-moving party, may not rest upon mere allegations in the pleadings, but must instead set forth specific facts, in the form of exhibits and sworn affidavits or testimony, illustrating the existence of a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 322-24.  As plaintiff has failed to do so, plaintiff cannot rely on the unsupported claim that other women were terminated subsequent

to filing EEO claims.  See Goldberg v. B. Green and Co., 836 F.2d 845, 848 (4th Cir. 1988)

(noting that conclusory assertions that an employer's motivation is disputed is insufficient to

withstand summary judgment; rather plaintiff is required to present affidavits or other evidence

supporting such claims).

### 3.  Male Co-workers' Non-Termination for Similar Misconduct

Plaintiff next argues that several probationary male co-workers who did not file EEO

claims were not terminated based on misconduct that plaintiff characterizes as more serious than

her decision not to sweep.  Plaintiff contends that defendant's failure to terminate such workers

provides circumstantial evidence that she was terminated based on her sex and the fact that she

filed an EEO complaint.  Although not labeled as such by plaintiff or defendant, plaintiff's

contention is essentially a form of a disparate discipline claim, that is, plaintiff was terminated

because she was a female and filed an EEO claim and men who didn't file EEO claims who

engaged in conduct comparable in seriousness to plaintiff's conduct were given a less severe

penalty.  See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993).  The difficulty that

arises with evaluating such claim is that the court must compare the offenses and the discipline

imposed, keeping in mind that "the comparison will never involve precisely the same set of

work-related offenses occurring over the same period of time and under the same sets of

circumstances."  Cook, 988 F.2d at 511.  As the facts and circumstances of misconduct will

always vary, the court must consider the seriousness of the offenses alleged and determine if it

was comparable.  See Moore v. Charlotte, 754 F.2d 1100, 1107 (4th Cir. 1985) (stating that a

district court must "assess[ ] the gravity of offenses on a relative scale").

Here, plaintiff claims that: (1) William Ellis, a male probationary guard, threatened to

shoot a co-worker; (2) that plaintiff witnessed Ellis and Gus Valez having a verbal altercation requiring that they be separated; (3) that Ellis and Mr. Hooper "refused to go to post twice" (Pl. Reply 5); and (4) that Mr. Carrol, another probationary employee ,was recommended for termination for refusing an order but Carrol was reassigned to a different shift rather than terminated.[15]   Plaintiff highlights the fact that none of these male guards were terminated and that they received minor punishments such as a few days suspension or were required to change shifts. (Pl. Memo 5).   Although plaintiff attempts to submit a co-worker's sworn statement in support of her claims,[16] the testimony before the court disproves rather than proves plaintiff's allegations.   First, the record establishes that an investigation was made into Ellis' alleged threat and it was determined that no threat was made; therefore, Ellis was not disciplined (Test. 141).[17] Second, as to the altercation between Ellis and Valez, defendant has advanced evidence that Connor, the chief of law enforcement, was not even aware that such <u>verbal</u> altercation occurred (Test. 142).   Furthermore, although plaintiff submitted Valez's statement regarding the argument, such statement again refers to the incident merely as a verbal confrontation and does not allege that the incident was ever reported to Connor or another superior (Pl. Suppl. Ex.1(b)).   Therefore,

---

[15] Plaintiff fails to provide a first name or other details regarding Mr. Hooper or Mr. Carrol; however, from the context of plaintiff's brief, both appear to be plaintiff's co-workers.

[16] Plaintiff's supplement includes a statement purportedly signed by Gus Valez; however, such statement was not notarized nor signed "under penalty of perjury," and therefore, is not a proper affidavit.   However, even assuming that the form of the "affidavit" was satisfactory, the statement fails to create a genuine issue as to a material fact.

[17] Plaintiff alleges in her brief that Ellis was suspended for two days for the threat but provides no support for such claim.   Connor states under oath that after the investigation determined that a threat was not made, Ellis was not given time off without pay, but rather Ellis elected to take two days of leave to "cool off" (Test. 141).   Although plaintiff's supplement included an excerpt from Ellis' testimony which states that Ellis took the two days off "at the suggestion of Mr. Connor," such testimony does not conflict with Connor's sworn statements.

there is no evidence, nor even detailed but unsubstantiated facts, suggesting that the argument

between Ellis and Valez was similar in severity to refusing a direct order from a supervisor.[18]

Third, as to plaintiff's unsubstantiated claim that Ellis and Hooper failed to go to post twice,

Connor states under oath that he is only aware of one incident and it occurred because, at that

time, Connor was

the only supervisor for a force of fifty guards and he worked at the Provost Marshal's office, not

at the main gate (Test. 143-44).   Connor explains that there were some problems with the guard's

schedule as there was little direct supervision and the guards were unsuccessfully trying to work

out their own schedules (Test. 143-45).   Connor states that he was never informed that anyone

refused to work; rather, several guards just "didn't go to where everybody else thought they were

supposed to go" (Test. 144).   Furthermore, although the rotating military supervisor at the gate

"basically" handled the guards' schedule, the military supervisor did not come to Connor with

the rotation issue; rather, it was Ms. Williams who raised the problem (Test. 144).   After Ms.

Williams complained, Connor instituted a detailed rotation schedule that did not afford the

guards any flexibility (Test. 144).   Plaintiff has neither offered evidence differing from Connor's

---

[18] Valez's statement indicates that he voluntarily changed shifts based on the verbal confrontation with Ellis (Pl. Supp. 1(b)).  However, such statement fails to provide any detail about the confrontation and fails to allege that it was even reported to superiors.  Notably, without superiors' knowledge of such argument, they would not be in a position to discipline or not discipline the individuals involved.  On a related point, plaintiff highlights in her brief that Valez's statement indicates that he changed shifts based on the altercation but that Connor states under oath that Valez requested a shift change based on religious reasons.  Although there is clearly a conflict in such statements, it is immaterial to the question of whether or not male employees were disciplined to a different degree than plaintiff as under either scenario, Valez voluntarily requested the shift change.  As previously noted, plaintiff cannot establish pretext merely "by focusing on minor discrepancies that do not cast doubt on the [proffered] explanation's validity, or by <u>raising points that are wholly irrelevant to it.</u>"  <u>Hux v. City of Newport News, Va.,</u> 451 F.3d 311, 315 (4th Cir. 2006) (emphasis added).

sworn testimony nor even provided unsubstantiated details alleging that such conduct was similar to her refusal to carry out a direct order.  Plaintiff's unsupported or inaccurate references to the alleged misconduct discussed above fails to support her claim that such employees were treated differently as even considering the evidence in a light most favorable to plaintiff, there is nothing that suggests that any of these occurrences were similar in severity to plaintiff's misconduct.

The final disparate discipline allegation that plaintiff advances involves Mr. Carrol, who was not terminated after repeated misconduct and after what plaintiff characterizes as "refus[ing] to carry out a work assignment" (Pl. Reply 5).  An examination of the testimony provided by plaintiff indicates both that Carroll's repeated infractions were relatively minor and that although Carrol did disobey an order on one occasion, it nearly led to Carrol's termination; furthermore, as discussed in more detail below, although Carrol did not perform his job as instructed, he did not refuse to carry out a work order.  First, with respect to the minor infractions, Carrol was written up for having too much hair on his face, arriving late to work, and not having his uniform up to standards (Test. 239).  Assessing the "gravity" of such infractions, the court concludes that Carrol's failure to maintain his appearance or arrive on time are not comparable to disobeying a direct order issued by two different superiors; therefore, plaintiff cannot establish that she was disciplined differently based on misconduct of similar severity.

Carrol's more severe misconduct did involve failing to follow instructions while Carrol was still a probationary employee.  On the day of his misconduct, Carrol was part of an armed roving patrol and was specifically instructed by supervisor Bielling not to turn in his weapon prior to 1:20 pm; however, Carrol turned in his weapon at 1:10 pm (Test. 208-09). After this occurred, Bielling spoke with Connor and they both agreed to recommend that Carrol be

terminated (Test. 209).  Sometime after such event, Colonel Don Carter saw Carrol leaving the Provost Marshal's office crying because Carrol was informed that Bielling and Connor were discussing his termination (Test. 238-39).  Col. Carter spent some time talking with Carrol, and discovered that Carrol was having "some very, very difficult times in his life"; Carter later spoke with Connor and they decided that rather than terminating Carrol they would move him to a different shift (Test. 238-39).  Such decision was based on what Carrol had told Col. Carter and Carter's belief that Carrol was "salvageable" (Test. 240).  In contrast, Carter states that he did not believe that plaintiff was "salvageable" because she "blatantly defied the orders of someone appointed over her" (Test. 240-41).  Col. Carter states under oath that he did not know that Carrol had turned in his gun early because, based on the timing of events, Carter spoke with Carrol before Carter had the opportunity to speak with Connor (Test. 240).  Such fact further undermines plaintiff's discrimination and retaliation claims as Col. Carter made the decision to retain Carrol without knowing that Carrol had disobeyed an order whereas Carter plainly knew that plaintiff had disobeyed orders when he decided that plaintiff's termination was appropriate.

Although plaintiff failed to establish that Carrol, or any other guard, ever refused to carry out a work assignment as ordered by their superiors, plaintiff has clearly established that Carrol not only was cited for repeated minor infractions, but that he also disobeyed an order on one occasion as he turned in his weapon ten minutes earlier than ordered.  However, the fact that both Bielling and Connor sought to terminate Carrol's employment after he disobeyed an order undermines plaintiff's claim of disparate treatment.  Notably, Carrol was a male who did not file an EEO complaint, yet as soon as he disobeyed an order, he was recommended for termination by his supervisors.  The fact that Carrol ultimately avoided termination because he was able to speak

with Colonel Carter and relay his personal problems does not suggest that Carrol's sex or non-filling of EEO complaints had anything to do with the decision; rather, his personal situation helped him avoid dismissal.  Furthermore, the fact that Carter didn't even know of Carrol's failure to follow an order when he sought to retain Carrol further suggests that minor misconduct by guards does not generally result in termination, no matter your sex or your EEO status, but that major misconduct does.[19]

In addition to the discussion above, plaintiff's claim that male employees who didn't file EEO complaints were punished less severely than she was is undermined by the events that occurred on February 20, 2003, the day that plaintiff refused to sweep and was notified that she would be terminated based on such refusal.  Specifically, plaintiff provides the sworn testimony of Joey Tisdale, a swing-shift guard, who stated that the oncoming shift was told that they would have to help with the cleanup, several guards did not want to help, and as their supervisor was not available, Tisdale and the others went to speak with Connor (Test. 287).  Connor told the guards that "we need you guys to do this" and that "we already had one person terminated for refusing to do it" (Test. 288).  When Tisdale persisted in trying to obtain clarification as to why a security guard needed to clean-up, Connor said that "the bottom line is you've got to do it or you're going to be terminated" (Test. 289).  Such statement establishes that Connor was not out to get plaintiff because she was female or because she filed an EEO complaint; rather, Connor was willing to fire any guard, male or female, EEO complaint or no complaint, if they persisted in refusing to carry out their work assignment.  The fact that plaintiff was the first person to

---

[19] It should be highlighted that plaintiff was also involved in "minor misconduct" in that she was abusing defendant's sick leave policy and was on one occasion found reading at the camera monitoring station.  Just as Carrol wasn't fired for his minor misconduct, neither was plaintiff.

refuse to sweep is of no consequence; she refused, she persisted in refusing, and she never swept even while her supervisors and every other guard participated in the clean-up (Test. 131, 260-61). Although the swing-swift guards were given the benefit of an ultimatum and plaintiff was not, such fact does not establish discrimination, as defendant has every right to terminate a probationary employee if only to set an example for others.  Plaintiff's misfortune of being the first guard to refuse is not synonymous with sex or EEO discrimination merely because plaintiff happens to be a female who previously filed an EEO claim.

### 4.  Plaintiff Never "Refused" to Carry out Directive to Sweep

Plaintiff's final argument is essentially an exercise in semantics because although plaintiff admits that she never swept as instructed by her superiors, she contends that she never actually "refused" to sweep (Test. 75, 276).  Plaintiff's claim that she never "refused" to sweep is supported by the sworn testimony of a co-worker, James Gillis, who states that plaintiff, Gillis, and a few other guards were told by Ellis, the acting supervisor, that Connor had instructed that the guards perform sweeping around the visitor center and gate (Test. 268-69; Pl. Supp. Ex.1(b)). At this stage in the proceedings, the court assumes that plaintiff did in fact respectfully state that she needed to talk to her union representative prior to sweeping; however, no matter what terminology is chosen, "refuse," "decline," "would not perform without union authorization," it is undisputed that on two separate occasions a superior instructed plaintiff to sweep, and on both occasions she did not.

Acting supervisor Ellis' testimony supports plaintiff's version of events, as Ellis stated that he told plaintiff that she could call the union if she wanted, but that she was still required to sweep because the guards were still probationary and if asked by their superiors to cleanup, "that

was what [they] were supposed to do" (Test. 311).[20]  Ellis also indicates that, initially, none of the guards wanted to sweep, but after Ellis told them that the instruction came from above and anyone not sweeping would be reported to Connor, everyone but plaintiff agreed to sweep (Test. 310-11).  Ellis further explains that he informed plaintiff and all the other guards that it was part of their job description to sweep or mop or take out trash around Building 2, but that plaintiff still indicated she wouldn't sweep until she spoke with a union representative, and plaintiff suggested that she relieve someone else at the guard gate so that a different guard could sweep (Test. 312).

When plaintiff arrived at the guard gate she was again asked to sweep, this time by Sgt. Joshua Donecker who was unaware that plaintiff had already declined to sweep after being instructed to do so by Ellis (Test. 255, 258).[21]  Plaintiff stated that she would not participate in the cleanup until she heard back from her union representative; Sgt. Donecker asked her a second time to sweep and indicated that everyone, himself, DOD guards and National Guard members, were required to participate in the cleanup (Test. 260-61).  Furthermore, Sgt. Donecker warned plaintiff that if she did not participate he would have to report her actions to the Provost Sergeant; plaintiff said that she understood, and Donecker did in fact report plaintiff to Sgt.

---

[20]  Connor's sworn testimony establishes that he personally performed plaintiff's training class and that she was instructed at training that, as long as it was not immoral or illegal, when she was given an order she was required to comply; if she though it improper, she would be able to later file an EEO complaint (Test. 130).

[21]  Plaintiff's brief also claims that when Donecker instructed her to sweep a male security guard at the gate was not directed to sweep; although no details or exhibits are provided by plaintiff, it appears that plaintiff's intent is to argue that she was treated differently because she was a woman.  However, such claim is plainly foreclosed by Connor's sworn testimony which establishes that the male guard who was not instructed to sweep was, at the time, the only armed guard at the entrance gate and was not permitted to leave his armed post (Test. 130-31).  After the armed guard was relieved he swept "just like everyone else . . . with the exception of Ms. Williams" (Test. 131).  Again, plaintiff's unsubstantiated and spurious accusations fail to establish that she was discriminated against.

Saylor (Test. 261). Plaintiff states in her memorandum that "upon arriving back at the Security Office, Mr. Connor presented Complainant with a recommendation for termination" and that her termination was then used as an ultimatum to threaten the reluctant swing-shift guards into cleaning up (Pl. Memo. 5). Although plaintiff did not provide the transcript pages cited in her brief to support such claims, Ellis' testimony, provided by defendant, and Tisdale's testimony provided in plaintiff's supplement, support plaintiff's claim that the swing-shift was reluctant to cleanup, that Connor told the complaining guards that he had already fired someone for refusing to sweep, that Connor told such guards that they were to perform the cleanup or be terminated, and that ultimately everyone other than plaintiff helped cleanup (Test. 287-89; 315-16). Plaintiff's claim that she never "refused" a work assignment fails to establish that defendant's proffered justification for terminating plaintiff was pretextual nor demonstrates that there is a genuine dispute as to a material fact precluding summary judgment.

## V. Conclusion

Plaintiff's complaint and memorandum in opposition to summary judgment advance numerous claims, some supported in part by established facts, some merely by supposition. However, from a legal standpoint, all of plaintiff's claims either fail to state a claim on which relief can be granted, or fail to rebut defendant's proffered non-discriminatory reason for terminating the plaintiff. Although the court considers the evidence in a light most favorable to plaintiff, plaintiff has failed to advance sufficient evidence in support of her claims, and the court must rule based on the sworn testimony and other exhibits before it. Furthermore, although there are numerous excerpts from the administrative testimony provided by defendant, the court is not under a duty to scour exhibits searching for a triable issue which would justify denying

defendant's motion.  See Rouse v. Nielsen, 851 F. Supp. 717, 723 (D.S.C. 1994) ("It is not the Court's duty to search the record to ascertain whether it is bereft of a genuine issue of material fact."); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989) (same).  Rather, once the moving party has met its initial burden, which defendant has, than the onus is shifted, requiring the non-moving party to "come forward and demonstrate that such an issue does, in fact, exist."  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003). Nevertheless, here, in light of plaintiff's pro se status, the court did in fact spend considerable time sifting through the exhibits; however, rather than finding support for plaintiff's claims, the record largely undermined plaintiff's factual contentions and it became clear to the court that plaintiff is unable to meet the legal standards necessary to defeat defendant's motion summary judgment.[22]  See Hux, 451 F.3d at 319 ("In enacting Title VII, Congress sought to eliminate unlawful discrimination in the employment setting, but it did not endeavor to force employers to undergo the burdens of trial whenever a plaintiff proffered simply any response to an employer's non-discriminatory justifications.").

---

[22] The record, taken as a whole, suggests that plaintiff repeatedly acknowledges that she is prepared for an undesirable scenario and then when such occurs, she claims that she was discriminated against.  First, plaintiff admits that when she was hired she knew that Sundays would sometimes be required, something undesirable to someone who has such a strong preference for worshiping at a certain church at a certain time on Sundays.  Nevertheless, plaintiff voluntarily took the job, yet the moment she faced the reality of working on a Sunday, she immediately went to management and attempted to avoid what she had previously agreed to; thereafter, she alleged discrimination for being required to work on Sundays.  Likewise, on February 20, 2003, the day the entire Fort Eustis guard force was required to sweep and perform other cleanup duties in preparation for a visit by one of the highest ranking generals in the Army, plaintiff indicated to both Ellis and Donecker, two superiors, that she would not sweep prior to obtaining union approval.  Plaintiff was warned by Ellis that she would be reported to Connor and warned by Donecker that she would be reported to the Provost Sergeant if she persisted in refusing to sweep and plaintiff indicated that she understood that she would be reported but she voluntarily chose not to sweep absent union approval.  When plaintiff was terminated for refusing to carry out a work order after being warned twice that she would be reported for not sweeping, plaintiff again blamed her misfortune on discrimination.

For the reasons discussed more fully above, defendant's motion to dismiss and motion for summary judgment are **GRANTED**.  Plaintiff's failure to promote, hostile work environment, and harassment claims are not properly before this court and therefore, fail to state a claim for which relief can be granted.  Plaintiff's failure to accommodate and wrongful termination claims, as well as plaintiff's hostile work environment and harassment claims, cannot survive summary judgment as defendant has provided ample evidence of a non-discriminatory justification for its actions and plaintiff has failed to provide sufficient evidence to rebut such explanation.  As a result, defendant is entitled to summary judgment, thereby terminating this matter in defendant's favor.  Additionally, because defendant's dispositive motion is granted, plaintiff's motion for a jury trial is deemed **MOOT**.

The pro se plaintiff is advised that she may appeal from this final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510.  Said written notice must be received by the Clerk within sixty (60) days from the date of this Order.

The Clerk is **REQUESTED** to mail copies of this Order to the pro se plaintiff and to counsel for the defendant.

**IT IS SO ORDERED.**

_____
/s/
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August  21 , 2006